Filed 7/9/26  P. v. Alsawafi CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085793 |
| Plaintiff and Respondent, | (Super. Ct. No. SCE421161) |
| v. | |
| ALI ABDELMEHDI ALSAWAFI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Aaron H. Katz, Judge.  Affirmed and remanded with instructions.

Patrick M. Ford under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Daniel Rogers and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Following an argument with his father's new neighbors about parking, defendant Ali Abdelmehdi Alsawafi pulled out a handgun, pointed it at the neighbors, threatened to kill them, and fired a gunshot "right above" their heads. A jury found him guilty of assault with a semiautomatic firearm (Pen. Code,[1] § 245, subd. (b)), making a criminal threat (§ 422, subd. (a)), and other charges, and further found that he personally used a firearm in the commission of these offenses (§ 12022.5, subd. (a)). The trial court sentenced Alsawafi to eight years in prison. Alsawafi raises multiple issues on appeal.

First, Alsawafi contends the prosecution team violated his rights under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) by failing to disclose footage from a neighbor's security camera that captured portions of the incident. Because Alsawafi has not met his burden to show that the underlying footage ever existed or was suppressed by the prosecution team, this challenge fails.

Second, Alsawafi argues that his firing of defensive and de-escalatory warning shots was insufficient to support his convictions for assault with a deadly weapon. This challenge misapplies the substantial evidence standard of review by ignoring evidence that showed Alsawafi fired his gun in anger "right above" his victims' heads, which is sufficient to support his assault convictions.

Third, Alsawafi maintains that his trial counsel rendered ineffective assistance by failing to request a pinpoint jury instruction stating there could be no assault if Alsawafi merely intended to frighten the alleged victims.

---

[1]     Statutory references are to the Penal Code unless otherwise indicated.

This contention fails because the requested instruction would have been an incorrect statement of the law.

Fourth, Alsawafi contends the trial court erred by failing to instruct the jury sua sponte that brandishing a firearm (§ 417) is a lesser included offense of assault with a semiautomatic firearm (§ 245, subd. (b)). Because the Courts of Appeal have consistently rejected this claim (see *People v. Steele* (2000) 83 Cal.App.4th 212, 214–215 (*Steele*)), which is based on dicta in a Supreme Court case (see *People v. Wilson* (1967) 66 Cal.2d 749 (*Wilson*)), this claim fails.

Fifth, Alsawafi argues that the trial court erred by imposing the firearm enhancement (§ 12022.5) because doing so violated both the statute's own terms and section 654's prohibition on double punishment. The statute, however, expressly contemplates imposition of the firearm enhancement in cases involving assault with a semiautomatic firearm. Accordingly, this argument fails.

Sixth, Alsawafi maintains the trial court violated section 654's prohibition on double punishment by sentencing him for both the assault and the accompanying criminal threat. Because the record supports the trial court's implicit finding that Alsawafi harbored separate intents when he committed the assault and when he made the criminal threat, this challenge fails. (See *In re Raymundo M.* (2020) 52 Cal.App.5th 78 (*Raymundo M.*).)

Finally, Alsawafi asserts that the trial court erred by denying him preconviction custody and conduct credits for the period he was on preconviction home detention. We agree that a portion of that period was sufficiently custodial to entitle Alsawafi to custody and conduct credits. Accordingly, we will remand for the trial court to recalculate Alsawafi's custody and conduct credits consistent with this opinion.

3

In all other respects, the judgment is affirmed.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

#### 1.  Prosecution Evidence

In late October 2023, Jose M., Cynthia M., and their four children[2] were moving back into their condominium unit in El Cajon after living for a while with a family member who needed assistance.  On two occasions in the days leading up to the incident, Cynthia briefly parked the family SUV at a curb marked "no parking" while unloading heavy items because the curb was closer than their assigned parking space to the family's residence.  On each occasion, Alsawafi's father, who lived in the condominium complex, screamed at Cynthia about her illegally parked SUV blocking the father's assigned parking space.  Cynthia told the father that she was just moving in and to let her know if he needed her to move the SUV.

Around 1:30 p.m. on October 29, 2023, the family parked their SUV at the "no parking" curb to unload a heavy dresser.  The younger daughter's boyfriend, E.M.,[3] was helping.  While the family was inside their condominium, Cynthia noticed someone outside — later identified as Alsawafi — taking pictures of their SUV.  Through the window, Cynthia told Alsawafi, " 'You don't have to take pictures of the car.  If you need us to move

---

[2]    The children were an 18-year-old daughter, a 15-year-old daughter, and 11-year-old twin sons.

[3]    We identify the boyfriend by his initials pursuant to California Rules of Court, rule 8.90(b)(10).

4

[it], just let us know.' " Alsawafi responded, " 'Shut the f[***] up, b[****], and move your f[***]ing car.' "

Jose went outside to "to see what the problem [was]." Cynthia, the daughters, and E.M. followed. None of them were armed. Alsawafi and his father were near the SUV and told Jose, " 'Move your f[***]ing car.' " Jose responded, "You don't need to talk to my wife [or me] that way," and explained the SUV was parked temporarily to unload. Alsawafi approached Jose, "got in [his] face," and said, " 'Get the f[***] out of my face. You don't know who I am.' " Alsawafi threatened to have the family kicked out of the complex. He also told Jose, " 'You're going to tell me every time you guys come and go from here' " and that the family needed Alsawafi's permission to park there. At some point, Jose told Alsawafi something to the effect of, "You don't tell Chicanos what to do." Meanwhile, Alsawafi's father was yelling at Cynthia and the daughters. Alsawafi and his father both appeared angry.

To deescalate the situation, Jose told his older daughter to move the SUV. She did so and the argument ended. Alsawafi's father nodded or gestured to Alsawafi that the situation was over and they should return to the father's condominium.

As Alsawafi and his father began walking away, the family and E.M. followed from about 15 feet behind. When Alsawafi got to the entrance to Jose and Cynthia's condominium, Alsawafi turned around, drew a handgun from his waistband, pointed it at the family, waved it back and forth, and threatened, " 'You guys think I'm f[***]ing playing? I'm not f[***]ing playing. Do you want to die? I'll f[***]ing kill you.' " Jose, Cynthia, and all the children were afraid Alsawafi would shoot them. Alsawafi then raised his gun "slightly above" (according to Jose) or "right above" (according to

5

Cynthia) the group's heads and fired one shot.  He screamed again, " 'You think I'm playing?  You guys think I'm playing?  I'm not f[***]ing around.' "

To draw Alsawafi's attention away from Cynthia and the children, Jose told Alsawafi, "I'm not afraid.  I'm not afraid. . . . You think I'm scared?  I'm not afraid. . . . I'm right here.  I'm not f[***]ing scared.  Did I run?  Did I flinch?"  Jose testified at trial that he was, in fact, "100 percent afraid."  Alsawafi began returning to his father's condominium again, but then advanced on Cynthia and said, " 'You're sorry now, aren't you, b[****]?  Aren't you sorry?' "

A neighbor intervened to push Alsawafi away, saying, " 'Cousin, cousin, go back inside.' "[4]  Alsawafi nearly entered his father's condominium, but then turned around, pointed his gun at Jose and Cynthia, and fired two more shots toward the sky.  Alsawafi returned to his father's condominium, saying, "I'm not f[***]ing playing" and, "Oh, you're not scared now?"

Jose and Cynthia went inside their home and Cynthia called 911.  While she was on the phone, Alsawafi left the complex.  Jose checked on his children and found his two sons hiding under a dresser in their bedroom, the younger daughter and E.M. hiding in another room, and the older daughter sitting on her bed shaking.

Police responded to the complex to search for Alsawafi and to canvass the area for witnesses and surveillance cameras.  The younger daughter gave police two photos she took of Alsawafi during the incident, and a neighbor provided footage recorded by his "Ring" video camera.  The motion-activated

---

4    The neighbor testified that he did not know Alsawafi but knew that he, like the neighbor, was Iraqi and that it is common for Iraqis to "call each other family/cousin."

6

Ring camera captured portions of the verbal altercation near the SUV and audio of the second shooting and related arguing. The camera recording did not capture video of either shooting because, as the camera's owner testified, the "camera doesn't capture where the shooting actually took place."

Police searched Alsawafi's father's condominium (with his consent) and found two semiautomatic pistols, three gun cases, and ammunition. Police also collected one 9-millimeter shell casing that Jose picked up at the location of the first shooting, and two 9-millemeter shell casings from in front of Alsawafi's father's condominium.

Police issued a "be on the lookout" for Alsawafi. The morning after the incident, police saw Alsawafi's car parked down the block from his father's condominium. Police watched the car from a distance and arrested Alsawafi when he went to it. Police searched the car and found two handguns (a fully loaded revolver and a partially loaded semiautomatic handgun) in the center console, and an AR-15 rifle in the trunk. The semiautomatic handgun could hold 17 rounds but contained only 14 (i.e., it was missing the same number of rounds that Alsawafi fired at the complex). The AR-15 had a pistol grip and a detachable magazine, features that made it an illegal assault rifle.

### 2. Defense Evidence

Alsawafi testified on his own behalf that he acted in self-defense. The incident occurred at the complex where his father then lived (he since moved out). Alsawafi occasionally slept over after helping care for his aging father. On the day of the incident, Alsawafi was leaving his father's condominium to go to the shooting range when he noticed the illegally parked SUV. Based on the father's past encounters with Cynthia, which all turned argumentative, Alsawafi and his father decided to document the issue by taking pictures

7

instead of asking Cynthia or Jose to move the SUV. When Alsawafi heard Cynthia repeatedly tell him not to take pictures of the SUV, he finally responded, "Well, okay. Move your f[***]ing car, then."

Cynthia, Jose, their daughters, and E.M. exited their condominium and a verbal argument ensued. After several expletives were exchanged, Alsawafi and Jose "kind of walked towards each other." Alsawafi testified he felt threatened and was "shaking" from fear, so he called 911. A recording of this call was played during the defense case. Alsawafi told the 911 operator to "get the police over here" because "we got some crazy people" who "are not moving their car and they're threatening us."[5] Once the operator learned that the call involved a parking dispute on private property, the operator told Alsawafi to direct his complaint to the complex's management, and the call ended. When Alsawafi realized the police were not coming, he "decided the best thing to do was leave," so he and his father began retreating to their condominium.

To get to the condominium, Alsawafi had to squeeze between his adversaries, who "were kind of spread out." As Alsawafi passed, "[E.M.] kind of made a quick motion that scared [Alsawafi]" and caused him to "flinch." As Alsawafi and his father retreated, the family taunted and mocked them for being cowards. Although Alsawafi was no longer afraid as he was walking away, he got "a little annoyed" at the insults and "told them to shut

---

[5] The 911 recording also captured some of the argument in the background, including Jose saying, "You don't mess with Chicanos, homeboy"; E.M. saying, "What you gonna do? Nothing."; Alsawafi saying, "Bro, you are f[***]ing with the wrong person right now."; and one of the daughters taunting Alsawafi for "shaking."

the f[***] up." Jose responded, "What did you say to me?", and "started fast-walking" aggressively toward Alsawafi and his father.

Out of fear for his own and his father's safety, Alsawafi "made a split-second decision to pull" a handgun from his waistband, "rack [the] slide, and fire one shot straight in the air." He did not threaten anyone, point the gun at anyone, or intend to hurt anyone. Rebutting Jose's testimony, Alsawafi testified he would never "point a gun at someone, raise it slightly above their head, and pull the trigger . . . because there's no guarantee it goes slightly above their heads. It might hit their head. It might go over their head. No one's that accurate." Although Alsawafi had a membership to a gun range, he did not consider himself "an expert marksman."

Jose reacted to the shooting by saying, " 'Flinch? Did I blink? Did I stutter? Do you think I'm scared of a gun?' " Alsawafi's gun had jammed after firing the first round, so he turned around to clear it, and when he faced the family again said, "Do you think I'm playing? Try me, mother[***]er." Alsawafi and his father thought the incident was over, so they resumed walking toward their condominium. Jose, however, continued to yell at Alsawafi and advanced on him again. Cynthia tried unsuccessfully to stop Jose, and a neighbor and Alsawafi's father tried to get Alsawafi to go inside. But when Jose kept advancing, Alsawafi raised his handgun and fired two more shots straight up in the air, never pointing the gun at Jose or his family. This "kind of stopped" Jose, so Alsawafi "felt the best thing to do was go inside."

Alsawafi went inside for a few minutes and then walked to his electric car and drove it to a charging station. He "wasn't fleeing per se," he just "didn't want to be around the situation."

9

Regarding the AR-15 in his trunk, Alsawafi testified he bought it that way from an authorized gun dealer and was unaware it was illegal.

On cross-examination, Alsawafi admitted he lied to police during their investigation. Alsawafi denied he was "angry" during the altercation. Rather, he was "upset" and "afraid," but not in fear for his life. Alsawafi acknowledged that Jose and his family "were all unarmed."

## B. Procedural Background

The People charged Alsawafi with five counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 1–5); five counts of making a criminal threat (§ 422, subd. (a)); counts 6–10);[6] two counts of discharging a firearm in a grossly negligent manner (§ 246.3, subd. (a); counts 11 & 12); possession of an assault weapon (§ 30605, subd. (a); count 13); and two counts of carrying a loaded firearm on his person or in his vehicle (§ 25850, subd. (a); counts 14 & 15). The People further alleged Alsawafi personally used a firearm in the commission of the assaults, criminal threats, and firearm discharge offenses. (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8).)

The jury found Alsawafi guilty on all charges and found the firearm enhancement allegations to be true.

The trial court sentenced Alsawafi to eight years in prison.

---

[6]     During trial, the People dismissed the three criminal threat counts pertaining to the daughters and E.M. "based on . . . their inability to testify to what exactly the oral threat was."

## III. DISCUSSION

### A. No *Brady* Violation

Alsawafi contends the prosecution violated his rights under *Brady*, *supra*, 373 U.S. 83 by failing to disclose Ring surveillance footage showing the circumstances under which he fired the first gunshot. He maintains the error was prejudicial because it deprived him of evidence that would have corroborated his testimony that Jose was aggressively advancing on him prior to the gunshot and that Alsawafi shot straight up in the air rather than "right above" or "slightly above" the family's heads. On the record before us, Alsawafi has not met his burden to show that this video ever existed or that the prosecution withheld it. Accordingly, his *Brady* challenge fails.

### 1. Background

As noted, police obtained Ring camera footage of portions of the incident from a neighbor. The neighbor testified that the Ring camera was mounted at his condominium entrance to cover his front door and that it happened to also capture the complex's courtyard and parking lot area where the incident began. The camera is motion-activated, not sound-activated, and its field of view stays "constant, the way it's facing." "It records for a very short period of time, and then once there's no motion, just stops recording." The neighbor was initially reluctant to provide footage to the police because he did not want to get involved in the dispute, but he eventually gave the police all the footage he had. The neighbor testified that when he watched the footage before providing it, he "didn't see any shooting or any gun or any bullets" because the "camera doesn't capture where the shooting actually took place." The recording did, however, appear to capture the sound of offscreen gunshots from the second time Alsawafi fired his handgun.

11

The neighbor provided seven separate video files that were combined into a single file for use as a trial exhibit. Each clip is about one minute and five seconds long, and the combined video is about seven minutes and thirty-five second long. The first three clips show Jose and his family moving furniture; Alsawafi walking from the direction of his father's condominium offscreen toward his car, carrying a rifle case; and Alsawafi walking near the SUV. The fourth and fifth clips capture the verbal argument near the SUV. Between the fifth and sixth clips, there is an approximately four-minute gap. The sixth clip appears to begin when the camera is triggered by the neighbor walking into the complex's courtyard. The clip captures offscreen audio of arguing and possibly the sound of gunshots. The final clip shows Alsawafi walking from the direction of his father's condominium offscreen and across the complex's courtyard.

After the verdicts, Alsawafi moved for a new trial based on (among other things) the prosecution's alleged failure to produce video from the four-minute gap between the fifth and sixth video clips. Without supporting evidence, he insinuated that the prosecution team had video from that period but suppressed it. The People opposed the motion, explaining that they had produced "the full extent of surveillance that was provided by [the neighbor]." The trial court denied Alsawafi's new trial motion without specifically addressing his *Brady* claim.

### 2. Relevant Legal Principles

Under *Brady*, *supra*, 373 U.S. 83 "and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence. The duty extends to evidence known to others acting on the prosecution's behalf, including the police."

12

(*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709 (*Johnson*).) "For *Brady* purposes, evidence is material if it is reasonably probable its disclosure would alter the outcome of trial." (*Id*. at p. 709–710.)

" 'There are three components of a true *Brady* violation: [(1)] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued.' " (*Johnson, supra*, 61 Cal.4th at p. 710.) On appeal, the appellant bears the burden of establishing a *Brady* violation. (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282 (*Strickler*).) " 'We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence.' " (*People v. Masters* (2016) 62 Cal.4th 1019, 1067.)

### 3. Analysis

Alsawafi has not met his burden to show a *Brady* violation. The only *evidence* in the record regarding the topic is the neighbor's testimony that the shooting occurred outside the Ring camera's field of view and that he *heard* gunshots in one video clip but never *saw* anyone with a gun. Although the neighbor was likely describing the second instance of Alsawafi firing his gun, the first and second instances both occurred near the involved parties' condominium units, all outside of the Ring camera's field of view. Therefore, although there is an unexplained four-minute gap between video clips, Alsawafi has produced no evidence to support his allegation that the prosecution possessed but suppressed such footage. Alsawafi implicitly acknowledges this shortcoming by acknowledging in his reply brief that he

13

"will have to pursue this claim by way of habeas corpus." Accordingly, his *Brady* claim fails on direct appeal.

## B. Substantial Evidence Supports Alsawafi's Assault Convictions

Alsawafi contends insufficient evidence supports his convictions for assault with a semiautomatic firearm because there is no evidence that his firing of defensive and de-escalatory warning shots "would directly, naturally and probably result" in a battery. (*People v. Williams* (2001) 26 Cal.4th 779, 788 (*Williams*).) We are not persuaded.

The elements of an assault with a semiautomatic firearm are: (1) the defendant did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person; (2) the defendant did the act willfully; (3) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (4) when the defendant acted, he had the present ability to apply force with a semiautomatic weapon. (*People v. Golde* (2008) 163 Cal.App.4th 101, 121 (*Golde*), citing CALCRIM No. 875;[7] see § 240 ["An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."]; § 245, subd. (b) [making it a crime to "commit[] an assault upon the person of another with a semiautomatic firearm"].)

"Assault is . . . a general intent crime." (*Williams*, *supra*, 26 Cal.4th at p. 788.) It "does not require a specific intent to injure the victim." (*Ibid*.) The required mental state for assault is "aware[ness] of . . . facts that would

---

7    The trial court instructed the jury with CALCRIM No. 875.

14

lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct." (*Ibid*.)  In other words, "the 'test for assault is whether a reasonable person, viewing the facts known to [the defendant], would find that the act in question would directly, naturally, and probably result in physical force being applied to another, i.e., a battery.' " (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 207 (*Cruz-Partida*).)

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Staten* (2000) 24 Cal.4th 434,460 ["An identical standard applies under the California [and U.S.] Constitution[s]."].)  " 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118; see *People v. Jennings* (2010) 50 Cal.4th 616, 638 ["We neither reweigh the evidence nor reevaluate the credibility of witnesses."].)  "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings*, at p. 639.)

Alsawafi's substantial evidence challenge fails because numerous courts — including our Supreme Court — have held that "pointing a gun at someone in a menacing manner is sufficient to establish the requisite mental state" for assault. (*People v. Hartsch* (2010) 49 Cal.4th 472, 507–508; see *id.* at p. 508 [defendant committed assault where he "pointed a gun at [the victim] under threatening circumstances"]; *Cruz-Partida, supra*, 79 Cal.App.5th at p. 211 [holding that the defendant's "offensive and dangerous conduct along with the surrounding circumstances provide[d] substantial evidence of the necessary mens rea for assault" based on *either* his "intentionally point[ing] [a loaded gun] in the direction of" his victims *or* his "fir[ing] what he called a 'warning shot' at the ground"]; *People v. Raviart* (2001) 93 Cal.App.4th 258, 261–262, 264–267 [affirming two assault convictions where the defendant pointed a loaded gun at one police officer as the officer rounded the corner of a building while another officer crouched nearby around the corner]; *People v. Laya* (1954) 123 Cal.App.2d 7, 16 ["The mere pointing of a gun at a victim constitutes an assault with a deadly weapon, whether or not it is fired at all."].)  Under these authorities, Alsawafi committed assault with a semiautomatic firearm simply by drawing his gun and pointing it in a menacing manner.

Even if assault with a semiautomatic firearm requires more than that, the requirement would still be satisfied on this record.  Viewing the evidence in the light most favorable to the judgment, Alsawafi pointed his loaded handgun at five victims, threatened them, and then fired one round "slightly above" or "right above" their heads.  Alsawafi — admittedly not "an expert marksman" and whose hands were "shaking" with fear — acknowledged at trial that "there's no guarantee it goes slightly above their heads.  It might hit their head.  It might go over their head.  No one's that accurate."  Indeed,

16

even the court in *Williams*, *supra*, 26 Cal.4th 779, on which Alsawafi primarily relies to support his argument that assault requires action that "would directly, naturally and probably result" in a battery (*id*. at p. 788), found that requirement satisfied where the "defendant admittedly fired a warning shot at [the victim]'s truck even though he knew that [the victim] was in the near vicinity" (*id*. at p. 790; see *Cruz-Partida*, *supra*, 79 Cal.App.5th at p. 211 [affirming assault conviction where the defendant "fired what he called a 'warning shot' at the ground"]).  Not surprisingly, then, Alsawafi's trial counsel acknowledged in closing argument that this element was undisputed; he argued only that Alsawafi acted in self-defense.

Alsawafi further argues the assault convictions are unsupported because he testified that "the shot he fired was a warning shot, . . . not a shot motivated by anger at someone with whom he was upset."  This argument improperly ignores the victims' testimony that Alsawafi was angry and making threats when he fired his handgun.  (See *People v. Aguilar* (2019) 41 Cal.App.5th 1023, 1026 [when reviewing the record for substantial evidence, "[w]e accept all evidence supporting the judgment, disregard contrary evidence, and draw reasonable inferences in favor of the verdict"].)  However, after hearing the testimony, the jury was entitled to reject as not credible Alsawafi's claim that he only fired a warning shot.  (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162 [" 'it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends' "].)  Accordingly, we conclude substantial evidence supports Alsawafi's convictions for assault with a semiautomatic firearm.

17

## C. Alsawafi's Trial Counsel Was Not Ineffective for Failing to Request a Pinpoint Instruction Regarding Subjective Intent

Alsawafi contends his "trial counsel rendered ineffective assistance by failing to request a pinpoint jury instruction informing the jurors that there could be no assault if [Alsawafi] merely intended to frighten the alleged victims." This contention fails because the requested instruction would have been an incorrect statement of the law.

" 'In order to establish a claim of ineffective assistance of counsel, [the] defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." . . . If a defendant meets th[is] burden . . . , he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*People v. Lopez* (2008) 42 Cal.4th 960, 966; see *Strickland v. Washington* (1984) 466 U.S. 668, 690, 694.)

" 'Under appropriate circumstances, "a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case." ' " (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 220.) Pinpoint instructions " 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) "A defendant is entitled to a pinpoint instruction, upon request, only when appropriate." (*Ibid.*; *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 498 ["A *proper* pinpoint instruction must be given at a defendant's request." (Italics added.)].) "[A] trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not

18

supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30.) We review de novo whether a requested pinpoint instruction correctly states the law. (See *People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Brugman* (2021) 62 Cal.App.5th 608, 622, fn. 3.)

"Counsel [is] not ineffective for failing . . . to request an instruction that is an incorrect statement of the law." (*People v. Prock* (2014) 225 Cal.App.4th 812, 821, citing *People v. Cudjo* (1993) 6 Cal.4th 585, 616.)

Alsawafi has not met his burden to show that his trial counsel performed deficiently because a jury instruction regarding his subjective intent not to commit assault would have been an incorrect statement of the law. The Supreme Court made clear in *Williams*, *supra*, 26 Cal.4th 779, that a defendant's subjective intent is irrelevant when determining whether he or she committed assault. "[A] defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, *need not be subjectively aware* of the risk that a battery might occur." (*Id*. at p. 788, italics added, fn. omitted.) "For example, a defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." (*Id*. at p. 788, fn. 3.) Under these principles, even if Alsawafi subjectively intended only to frighten his victims, he would still be guilty of assault. (See, e.g., *Williams*, at p. 790 [defendant was guilty of assault for firing a warning shot]; *Cruz-Partida*, *supra*, 79 Cal.App.5th at p. 207 [same].) An instruction to the contrary would have been an incorrect statement of the law. His trial counsel, therefore, was not ineffective for failing to request it.

19

Alsawafi cites the pre-*Williams* decision of *People v. Wolcott* (1983) 34 Cal.3d 92, as authority for the proposition that " 'a conviction for assault may not be grounded upon intent only to frighten.' " (*Id.* at p. 99.) "[B]ut we must follow governing law from *Williams*, which sought to clarify past law" that erroneously implied assault was a specific intent crime. (*People v. Bipialaka* (2019) 34 Cal.App.5th 455, 460; see *Williams*, *supra*, 26 Cal.4th at p. 787 ["Recognizing that [past authority] may have been confusing, we now clarify the mental state for assault."]; *id.* at p. 782 ["[t]oday, we once again clarify the mental state for assault"]; *People v. Colantuono* (1994) 7 Cal.4th 206, 215 [identifying *Wolcott* as being among precedent that "implies assault might actually be a specific intent crime despite well established authority to the contrary"].)

## D. The Trial Court Had No Sua Sponte Duty to Instruct that Brandishing a Firearm is a Lesser Included Offense of Assault with a Firearm

Alsawafi contends the trial court erred by failing to instruct the jury sua sponte that brandishing a firearm (§ 417) is a lesser included offense of assault with a semiautomatic firearm (§ 245, subd. (b)). We find no error.

"A trial court has a sua sponte duty to instruct the jury on any uncharged lesser offense that is necessarily included in a charged offense if there is substantial evidence from which the jury could reasonably conclude that the defendant committed the lesser included offense but not the charged offense." (*People v. Lopez* (2020) 9 Cal.5th 254, 269 (*Lopez*).) An uncharged crime is a lesser included offense if it satisfies either of two tests, only one of

which — the statutory elements test — applies here.[8] (*Lopez*, at pp. 269–270.) " ' "[I]f the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former." ' " (*Ibid.*)

As noted, "assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) A violation of section 245, subdivision (b), requires "an assault upon the person of another with a semiautomatic firearm." In contrast, a person is guilty of brandishing a firearm under section 417 when the person, "except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel . . . ." (§ 417, subd. (a)(2).)

Since 1911, the Courts of Appeal have consistently held that "brandishing a firearm [is] not a lesser included offense to assault with a deadly weapon (firearm)." (*Steele, supra*, 83 Cal.App.4th at pp. 214–215; see *id.* at p. 218 [citing nine cases].) "The reason of course, is that it is theoretically possible to assault someone with a firearm without exhibiting the firearm in a rude, angry or threatening manner, e.g., firing or pointing it from concealment, or behind the victim's back." (*Id.* at p. 218; see *People v.*

---

[8] The alternative " ' "accusatory pleading test" ' " is met when " ' "the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense." ' " (*Lopez, supra*, 9 Cal.5th at p. 270.) But "[w]hen, as here, the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court must rely on the statutory elements to determine if there is a lesser included offense." (*People v. Robinson* (2016) 63 Cal.4th 200, 207.)

*Escarcega* (1974) 43 Cal.App.3d 391, 398 (*Escarcega*) ["Obviously an assault with a deadly weapon may be perpetrated without drawing or exhibiting it in a rude, angry, or threatening manner, or using it in a fight or quarrel. It might be committed by a hidden sniper, or by a stealthy prison stabbing, or in other innumerable ways without at the same time being a violation of section 417."].)

Alsawafi relies on an intervening Supreme Court case, *Wilson*, *supra*, 66 Cal.2d 749, which implied that brandishing was a lesser included offense of assault. (*Id*. at p. 764.) The *Wilson* court reversed an assault conviction due to the absence of an instruction on the offense of brandishing when "the evidence would have justified the conclusion that defendant committed a violation of [section 417] rather than the assault found." (*Ibid*.)

The Courts of Appeal routinely distinguish *Wilson*. The *Steele* court characterized *Escarcega*, *supra*, 43 Cal.App.3d 391 as "the most outspoken of the opinions" to distinguish *Wilson*. (*Steele*, *supra*, 83 Cal.App.4th at p. 220.) As summarized by the *Steele* court, *Escarcega* declined to follow *Wilson* for the following reasons: "a. The Supreme Court did not specifically state that brandishing was a lesser included offense to assault with a firearm. [¶] b. The court did not discuss the rationale behind lesser included offenses. [¶] c. The court did not overrule the prior published appellate court decisions holding that brandishing was not a lesser included offense to assault with a firearm. [¶] d. After publication of *Wilson*, the Supreme Court has consistently reaffirmed the principle that a lesser and necessarily included offense is one that must be committed in order to commit the greater offense. (The *Escarcega* court noted that it was possible to commit an assault with a firearm without brandishing it, therefore brandishing cannot be a lesser included offense to such an assault.) [¶] e. *Wilson* is not

22

supported by any prior or subsequent cases . . . ." (*Steele*, at p. 220, citing *Escarcega*, at pp. 399–400.)

As a further basis for disregarding *Wilson*, the *Steele* court observed that the *Wilson* court "failed to follow its own rule, i.e., that the determination of whether an offense is lesser included is made from the language of the statute or the information, and not from the evidence adduced at trial." (*Steele, supra,* 83 Cal.App.4th at p. 221; see *Wilson, supra,* 66 Cal.2d at p. 764 ["the *evidence* would have justified" the instruction (italics added)].)

In addition to the observations in *Steele* and *Escarcega,* we further note that when *Wilson* was decided, courts tended to require instruction on lesser *related* offenses as well as on lesser *included* offenses. (See, e.g., *People v. Geiger* (1984) 35 Cal.3d 510, 526; *Steele, supra,* 83 Cal.App.4th at p. 218 ["it has long been held that brandishing is a lesser related offense, rather than lesser included" offense, of assault].) The Supreme Court has since abandoned that approach. (See *People v. Birks* (1998) 19 Cal.4th 108, 112.)

*Steele* is the most recent published opinion to address this issue, and we find its and *Escarcega*'s reasoning to be sound. Scholarly commentary likewise finds *Steele* and *Escarcega* controlling on this issue. (See, e.g., 1 Witkin, Cal. Crim. Law (2024) Crimes Against the Person, § 216 [citing *Steele* for the rule that "[b]randishing a firearm [citations] is not a lesser included offense of assault with a firearm"]; see Judicial Council of Cal., Crim. Jury Instns. (2025 supp.) Bench Notes to CALCRIM No. 875 [citing *Steele* and *Escarcega* for the principle that "[a] misdemeanor brandishing of a weapon or firearm under . . . section 417 is not a lesser and necessarily included offense of assault with a deadly weapon"].) Pending further guidance from the Supreme Court, we elect to follow this consensus in

23

concluding that brandishing is not a lesser included offense of assault with a semiautomatic firearm under the statutory elements test.

## E. The Trial Court Properly Imposed the Firearm Enhancements

Alsawafi contends the trial court erred by adding firearm enhancements under section 12022.5 to his sentence for assault with a semiautomatic firearm. He argues that doing so violates section 12022.5's own statutory prohibition against imposing a firearm enhancement on an offense for which "use of a firearm is an element of that offense" (§ 12022.5, subd. (a)) and section 654's prohibition against double punishment for a single act or indivisible course of conduct. We conclude both of Alsawafi's challenges fail under section 12022.5, subdivision (d), which expressly provides that the enhancement "shall be imposed for any violation of Section 245 if a firearm is used."

### 1. Background

As noted, the jury found Alsawafi guilty of five counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 1–5) and further found that he personally used a firearm in the commission of these offenses in violation of section 12022.5, subdivision (a). The trial court sentenced Alsawafi to the low term of three years on count 1, and a consecutive low term of three years on the firearm enhancement attached to that count. The court imposed the same sentences on counts 2 through 5 but ordered them to run concurrently with the sentence on count 1.

24

## 2. Relevant Legal Principles

Use of a firearm is an element of assault with a semiautomatic firearm under section 245, subdivision (b).  (*Golde*, *supra*, 163 Cal.App.4th at p. 121.)

Section 12022.5, subdivision (a) provides that "any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, *unless use of a firearm is an element of that offense*."  (Italics added; see *People v. Rodriguez* (2009) 47 Cal.4th 501, 505 (*Rodriguez*) [referring to the italicized clause as an "exemption" to the enhancement requirement].)  However, subdivision (d) of section 12022.5 states:  "Notwithstanding the limitation in subdivision (a) relating to being an element of the offense, the additional term provided by this section shall be imposed for any violation of Section 245 if a firearm is used . . . ."  (See *Rodriguez*, at p. 505 [stating that this subdivision creates an "exception to the exemption"].)  Under section 12022.5, subdivision (d), then, when a defendant's "firearm use pertained to 'violation[s] of Section 245,' [the] defendant falls within the exception to the exemption and thus *is* subject to additional punishment under subdivision (a), for personally using a firearm in the . . . assaults."  (*Rodriguez*, at p. 505.)

Section 654, subdivision (a) states:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  "[W]hen a court determines that a conviction falls within the meaning of section 654, it is necessary to impose sentence but to stay the execution of the duplicative sentence."  (*People v. Duff* (2010) 50 Cal.4th 787, 796, italics omitted.)

When examining the potential interplay between a sentence enhancement statute and section 654, "courts should look first to the statutory language concerning the enhancement[]" (*People v. Ahmed* (2011) 53 Cal.4th 156, 161 (*Ahmed*)) because "[o]ften the sentencing statutes themselves will supply the answer" (*id*. at p. 163). "When this is the situation, recourse to section 654 will be unnecessary because a specific statute prevails over a more general one relating to the same subject. [Citation.] The court should simply apply the answer found in the specific statutes and not consider the more general section 654. [¶] Only if the specific statutes do not provide the answer should the court turn to section 654." (*Ahmed*, at p. 163.)

### 3. Analysis

Neither of Alsawafi's challenges to the trial court's imposition of the section 12022.5 sentence enhancement is persuasive.

As to Alsawafi's challenge based on the exemption in section 12022.5, subdivision (a) for offenses in which "use of a firearm is an element of that offense," Alsawafi acknowledges in his reply brief that he falls within section 12022.5, subdivision (d)'s "exception to the exemption" (*Rodriguez*, *supra*, 47 Cal.4th at p. 505), which requires that the enhancement "be imposed for any violation of Section 245 if a firearm is used" (§ 12022.5, subd. (d)). Accordingly, this challenge fails.

Alsawafi's challenge based on section 654 fares no better. "To decide this question, we turn first to the specific statute concerning the enhancements." (*Ahmed*, *supra*, 53 Cal.4th at p. 164.) Although subdivision (a) of section 12022.5 states a general rule that its enhancement does not apply when "use of a firearm is an element of [the underlying]

26

offense," subdivision (d) specifies that "[n]otwithstanding" the general rule, "the additional term provided by this section shall be imposed for any violation of Section 245 if a firearm is used." This statutory language makes clear that the Legislature contemplated and intended that defendants convicted of violating section 245 would be subject to punishment under both section 245 and "the additional term provided by" section 12022.5. "If section 654 barred any additional punishment . . . , then no enhancement at all would be permitted, a result obviously inconsistent with the function of sentence enhancements." (*Ahmed*, at p. 164.) Because the specific language of section 12022.5, subdivision (d) "provide[s] the answer" (*Ahmed*, at p. 164), we "simply apply the answer found in th[at] specific statute[] and [do] not consider the more general section 654." (*Ahmed*, at p. 163.)

Alsawafi's reliance on *People v. Buchanan* (2016) 248 Cal.App.4th 603 and *People v. Wynn* (2010) 184 Cal.App.4th 1210 to support a contrary conclusion is misplaced. These cases involved a different enhancement statute with different statutory language than the enhancement statute at issue here. (See *Buchanan*, at pp. 615–616 [addressing the interplay between the § 12022 firearm enhancement and conviction for being a felon in possession of a firearm]; *Wynn*, at pp. 1220–1221 ["stress[ing]" in a pre-*Ahmed* decision that the court's "decisions is limited to the particular circumstances of this case," which involved the interplay between the § 12022 firearm enhancement and assault with a deadly weapon under § 245].) Most significantly, the section 12022 firearm enhancement at issue in *Buchanan* and *Wynn* does not include an "exception to the exemption" (*Rodriguez*, *supra*, 47 Cal.4th at p. 505) that expressly requires the enhancement to "be imposed for any violation of Section 245 if a firearm is used" (§ 12022.5, subd. (d)).

## F. Section 654 Does Not Bar Separate Punishments for Assault and Making a Criminal Threat

The trial court sentenced Alsawafi to six years on count 1 (with identical, concurrent sentences on counts 2 through 5), and to a consecutive eight months on the criminal threat in count 6 (plus a concurrent 16 months on the criminal threat in count 7). Alsawafi contends the sentence violates section 654 because the punishment on the criminal threat counts impermissibly duplicates punishment for the same conduct on the assault counts. We disagree.

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) " ' " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor,' " ' " which " ' " 'are factual questions for the court.' " ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 354) " ' " 'If all of the offenses were incident to one objective, the defendant may [not] be punished . . . for more than one.' " ' " (*Ibid*.) "If, on the other hand, [the] defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).) "The temporal proximity of two offenses is insufficient by itself to establish that they were incidental to a single objective. [Citation.] Objectives may be separate when 'the objectives were either (1) consecutive even if similar or (2) different even if simultaneous.' " (*People v. Vasquez* (2020) 44 Cal.App.5th 732, 737.)

When a " 'court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, [it] is deemed to have made an implied finding each offense had a separate objective.' " (*In re L.J.* (2021) 72 Cal.App.5th 37, 43.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

Our court's decision in *Raymundo M.* is instructive. There, the juvenile court imposed separate punishments for assault with a deadly weapon and for making a criminal threat where the minor "raised a switchblade-like knife head-high," "chased another minor," and, when he got within 10 feet of the victim, said, " 'You're going to die today.' " (*Raymundo M.*, *supra*, 52 Cal.App.5th at pp. 82, 83.) Our court rejected the minor's claim on appeal that the duplicative punishments violated section 654. (*Id.* at p. 95.) The court found that "[s]ubstantial evidence support[ed] the juvenile court's implicit finding that [the minor] acted with separate objectives when he assaulted and then threatened" the victim because "the court could reasonably have found that [the minor] committed the assault with the objective of inflicting *physical* harm on [the victim], whereas [the minor] criminally threatened [the victim] with the separate objective of inflicting *mental or emotional* harm." (*Ibid.*) As our court noted, "Courts routinely recognize similar distinctions." (*Ibid.*, citing *People v. Mejia* (2017) 9 Cal.App.5th 1036, 1047 ["a reasonable trier of fact could conclude that the criminal threats were in furtherance of a separate criminal objective" of "mentally or emotionally terrorizing the victim," whereas the objective in committing torture was "the intent to cause extreme physical pain"], *People v. Solis* (2001) 90 Cal.App.4th 1002, 1022 [defendant who made criminal threats

29

and attempted to burn down victim's house "had distinct objectives: in making the [criminal] threats, the defendant intended to frighten whereas in committing arson an hour later the defendant intended to burn"], *People v. Louie* (2012) 203 Cal.App.4th 388, 398 ["There was sufficient evidence to support a finding by the trial court that defendants harbored multiple independent objectives when they threatened [the victim], then set her apartment on fire."], *People v. Phan* (1993) 14 Cal.App.4th 1453, 1466 ["the robbery of [K.D.] and the threat to cut off the hand of her eight-year-old son . . . were separate and divisible acts" (italics omitted)], and *People v. Tom* (2018) 22 Cal.App.5th 250, 261 ["The court reasonably could have concluded that in strangling [the dog], defendant intended to kill the dog, and that in putting oil on [the dog]'s body and attempting to light it on fire, defendant intended to burn the evidence that he had killed the dog thereby avoiding detection of his crime."].)

Likewise, here, we conclude that Alsawafi's "assault and criminal-threat counts arose from separate conduct that the [trial] court could reasonably have concluded were undertaken pursuant to separate objectives." (*Raymundo M.*, *supra*, 52 Cal.App.5th at p. 95.) As in *Raymundo M.*, the trial court could have reasonably found that Alsawafi threatened his victims with the intent to cause them *emotional or mental harm*, and assaulted them with a semiautomatic firearm with the intent to cause them *physical* harm. (*Ibid*.) In other words, the trial court could have reasonably found that Alsawafi's objectives in threatening and assaulting his victims were "independent of, and not merely incidental to each other." (*Harrison*, *supra*, 48 Cal.3d at p. 335.)

Alsawafi does not grapple with *Raymundo M.*'s reasoning. Instead, he argues "the record can only reasonably be interpreted to establish a single

objective — to get the [victims] to back off.  He sought only to de-escalate a dangerous situation.  He was not attempting to inflict physical or mental harm on that family."  This argument, however, misapplies the substantial evidence standard of review by stating the evidence in the light most favorable to Alsawafi.  (See *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 [a defendant "does not show the evidence is insufficient by citing only his own evidence, or by arguing about what evidence is *not* in the record, or by portraying the evidence that is in the record in the light most favorable to himself"].)

## G. Alsawafi Is Entitled to Additional Preconviction Custody and Conduct Credits

Alsawafi contends the trial court erred by denying him custody and conduct credits for the time he was on home detention before his conviction. The People maintain the trial court properly denied him credit because the terms of the home detention were not sufficiently custodial.  As we will explain, we conclude Alsawafi has shown that the conditions of his home detention were sufficiently custodial until the court removed a Fourth Amendment waiver condition.  Accordingly, we will remand for the trial court to recalculate Alsawafi's custody and conduct credits.

### 1. Background

Alsawafi was arrested on October 30, 2023, and released on bail that day.

On November 6, 2023, the trial court exonerated Alsawafi's bail, allowed him to remain out of custody, and placed him under the supervision of the probation department subject to the following conditions:  (1) a Fourth Amendment waiver; (2) a protective order prohibiting him from contacting

31

the victims; (3) GPS monitoring; and (4) "house arrest," with exceptions allowing him to go "to and from work, personal shopping, such as grocery stores, medical appointments, and the court."

On January 29, 2024, Alsawafi asked the court to "consider lifting his house arrest condition" to allow him to attend weekly religious services and "do things like go to the barber shop and other free movements." The trial court authorized Alsawafi to attend religious services on Fridays from noon to 1:30 p.m. but otherwise denied his request.

An April 2, 2024 minute order shows that the trial court "deleted" Alsawafi's Fourth Amendment waiver condition, but left the protective order in place. The record does not indicate what led to these actions.

On June 18, 2024, the trial court granted Alsawafi's motion to modify the conditions of his release. The court's minute order states: "Home detention is deleted. GPS remains." The court reimposed a Fourth Amendment waiver.

On October 16, 2024, Alsawafi asked the court to remove his GPS monitoring requirement because his new living arrangement "ma[de] it incredibly difficult for him to charge his device." The court granted this request over the People's objection.

On November 5, 2024, the jury found Alsawafi guilty. The court ordered that Alsawafi be remanded into custody "forthwith."

On February 28, 2025, the trial court sentenced Alsawafi. At the sentencing hearing, Alsawafi's trial counsel argued that Alsawafi "should have over 500 days of credit" because "he was on house arrest initially." The court stated that this calculation was inconsistent with the court's records and that the court would request an updated credit calculation from the probation officer later in the hearing.

32

When the court later requested that update, the probation officer stated, "As far as CPAC credits, he was not booked with CPAC. What we believe he was on was SCRAM with GPS.[9] [¶] . . . [¶] With that being said, the actual credits would be 117 with 17 days of 2933s for a total of 134 days PC 2933.1."

The court then asked Alsawafi's attorney why he believed Alsawafi was on house arrest. Counsel explained it was because Alsawafi was not merely subject to GPS monitoring but was also "ordered to remain in his home" except "to go to work or school." The prosecutor clarified that the terms of house arrest allowed Alsawafi "to go to and from work, medical appointments, personal shopping, and court . . . . So I'm not sure how that somehow converts to credits being earned in that moment."

The court concluded, "[Defense counsel], if you find there's justification for additional credits, I'm certainly happy to afford Mr. Alsawafi those additional credits, but given the fact that he was released out on bond and ordered to be on simply a GPS tracker and that he was free to go to and from work, to and from school, to and from doctor's appointments, to and from court, I don't know that equates to being confined that would justify custody credits. [¶] But we can . . . certainly address that in the future if you'd like, but I'm going to go with the credits that have been awarded via probation."

## 2. Relevant Legal Principles

"Preconviction custody credits are governed by section 2900.5, subdivision (a), which provides in relevant part that '[i]n all felony and

---

9    Although it is not specified in the appellate record, the parties agree in their briefing that SCRAM is a privately monitored GPS service and CPAC is a county-run program.

33

misdemeanor convictions, either by plea or by verdict, . . . all days of custody of the defendant, including . . . days served in home detention pursuant to Section 1203.016 or 1203.018, shall be credited upon his or her term of imprisonment. . . .' " (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1087–1088 (*Gerson*).)  Section 1203.018 governs home detention before sentencing.  (*Gerson*, at p. 1088.)

Section 1203.018 authorizes a county "to offer a program under which inmates being held in lieu of bail in a county jail or other county correctional facility may participate in an electronic monitoring program" if certain conditions are met.  (*id.*, subd. (b).)  An " '[e]lectronic monitoring program' " is defined as including "home detention programs."  (*Id.*, subd. (j)(2).)  The statute authorizes the board of supervisors to "prescribe reasonable rules and regulations under which an electronic monitoring program pursuant to this section may operate."  (*Id.*, subd. (d).)

A participant in an electronic home monitoring program must "be supervised."  (§ 1203.018, subd. (n)(2).)  Although the statute leaves the exact terms of the supervision to the discretion of county authorities, the participant must, at a minimum, abide by the following restrictions: (1) "[R]emain within the interior premises of the participant's residence during the hours designated by the correctional administrator"; (2) "admit any probation officer or other peace officer designated by the correctional administrator into the participant's residence at any time for purposes of verifying the participant's compliance with the conditions of the detention"; and (3) the "electronic monitoring may include global positioning system devices . . . for the purpose of helping to verify the participant's compliance with the rules and regulations of the electronic monitoring program."  (*Id.*, subd. (d)(1)–(3).)  "The correctional administrator may permit electronic

34

monitoring program participants to seek and retain employment in the community, attend psychological counseling sessions or educational or vocational training classes, or seek medical and dental assistance." (*Id.*, subd. (h).) If a participant does not comply with the rules of the program, he or she may be retaken into custody without a warrant. (*Id.*, subds. (d)(4), (f).)

Our court has held that when a defendant is subject to preconviction electronic monitoring conditions under terms that are "as 'custodial, or restraining' as a statutory home detention program pursuant to section 1203.018" (*Gerson, supra*, 80 Cal.App.5th at p. 1089), equal protection principles entitle that defendant to preconviction custody credits under section 2900.5 and conduct credits under section 4019 (*Gerson*, at pp. 1089, 1092).

"Whether a defendant is in 'custody' for the purposes of section 2900.5 . . . is a matter of statutory interpretation, a question of law we review de novo." (*People v. Ravaux* (2006) 142 Cal.App.4th 914, 919.) "[T]he burden is on the accused to establish entitlement to presentence custody credit." (*People v. Shabazz* (2003) 107 Cal.App.4th 1255, 1258.)

### 3. Analysis

We conclude Alsawafi has met his burden to show that he was in custody for purposes of additional custody and conduct credits from the time he was placed on home detention until the court deleted his Fourth Amendment waiver on April 2, 2024. Beyond that point, the terms of his confinement were not sufficiently " 'custodial, or restraining.' " (*Gerson, supra*, 80 Cal.App.5th at p. 1089.)

Our court's decision in *Gerson* is instructive. (See *Gerson, supra*, 80 Cal.App.5th at p. 1087 & fn. 17.) In *Gerson*, the defendant was

35

"discharged to home detention with a GPS device and subject to other conditions" (*id*. at p. 1087) that "changed over time" (*id*. at p. 1087, fn. 17). "Initially, the court allowed him 90 minutes per day to do personal errands but required that he be accompanied by a responsible adult. The court then ordered him to surrender his passport, remain on GPS monitoring, abstain from alcohol, regularly drug test, and attend psychological counseling. Eventually, the court allowed him to work between 7:00 a.m. and 6:00 p.m. He was later allowed to work until 8:30 p.m. on Wednesdays and spend three nights a week at his girlfriend's home. He remained subject to a curfew, wore a GPS device and was subject to a Fourth Amendment waiver." (*Ibid*.) Our court found that because the defendant "was required to remain in his home during the hours designated by the court, wear a GPS device, and was subject to a Fourth Amendment waiver," the terms of his home detention were "at least as 'custodial, or restraining' as a statutory home detention program pursuant to section 1203.018." (*Id*. at p. 1090; see *id*. at pp. 1089–1090.)

Alsawafi's terms of home detention were at least as custodial as those in *Gerson* — until the trial court deleted Alsawafi's Fourth Amendment waiver on April 2, 2024. As in *Gerson*, Alsawafi was initially subject to GPS monitoring, a Fourth Amendment waiver, and "house arrest" subject to only a few exceptions. Two of those exceptions — attending work and medical appointments — are expressly authorized by statute. (See § 1203.018, subd. (h) ["The correctional administrator may permit electronic monitoring program participants to seek and retain employment in the community . . . or seek medical . . . assistance"].) The remaining exceptions — grocery shopping and, later, religious services for an hour and a half a week — are sufficiently circumscribed and, in any event, are certainly more restrictive than the three

sleepovers per week allowed in *Gerson*. (See *Gerson*, *supra*, 80 Cal.App.5th at p. 1087, fn. 17.)

However, once the trial court deleted the Fourth Amendment waiver, Alsawafi's conditions no longer met statutory requirements. (See § 1203.018, subd. (d)(2); *Gerson*, *supra*, 80 Cal.App.5th at pp. 1089–1090.) And although the trial court reimposed a Fourth Amendment waiver on June 18, 2024, the court at that time "deleted" home detention, which likewise precludes a finding of custody. (See § 1203.1018, subd. (d)(1); *Gerson*, at pp. 1089–1090.)

The parties request that if we conclude Alsawafi is entitled to additional preconviction custody and conduct credits — as we have — that we remand for the trial court to develop the factual record. We will do so.

## IV.  DISPOSITION

The judgment is affirmed.  The matter is remanded for the trial court to recalculate Alsawafi's custody and conduct credits consistent with this opinion, to amend the abstract of judgment accordingly, and to send a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

RUBIN, J.

WE CONCUR:

DO, Acting P. J.

CASTILLO, J.